09D02-2309-PL-000029

Filed: 9/18/2023 4:58 PM
Clerk

| | | |
|---|---|---|
| STATE OF INDIANA | ) | CASS COUNTY _____ COURT NO. ___ |
| | ) | |
| COUNTY OF CASS | ) | SS: |

| | | |
|---|---|---|
| Logansport Memorial Hospital | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. _____ |
| | ) | |
| Huron Consulting Services, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**Complaint for Declaratory Judgment and Injunctive Relief**

Plaintiff Memorial Hospital ("Hospital") files this Complaint against Huron Consulting Services, LLC ("Huron") seeking a declaratory judgment that a purported contract between Huron and the Hospital pursuant to which Huron seeks to recover windfall profits against Memorial Hospital is void and unenforceable under Indiana Law. Memorial Hospital also seeks a declaratory judgment that it owes no additional dollars for work that Huron allegedly performed for the Hospital. In support of this Complaint, the Hospital states as follows:

**The Parties and Jurisdiction**

1.       The Hospital is a not-for-profit, county-owned entity, created and operating pursuant to Indiana Code § 16-22-3-1 et seq.

2.       The Hospital is located at 1101 Michigan Road, Logansport, Indiana 46947 and serves as a regional medical center for the citizens of Cass County and north central Indiana.

3.       The Hospital is managed, controlled, and operated under the supreme authority and responsibility of a Governing Board which has enumerated powers as set forth in Indiana Code § 16-22-3-1 et seq.

4.       One of the powers of the Hospital is the power to contract for services with

consultants under the terms and conditions that the Governing Board finds reasonable, as provided for in Indiana Code § 16-22-2-6.

5.      Huron is a global professional services firm with its headquarters located at 550 W. Van Buren Street, Chicago, Illinois 60607.

6.      Huron markets itself as an expert consulting service provider to clients in the healthcare industry, among many other industries and professions.

7.      Huron performed work for the Hospital in Cass County, Indiana and the issues in this Complaint for Declaratory Relief arose out of Huron's actions in Cass County, Indiana.

8.      This Court has jurisdiction over the subject matter and the parties.

**Factual Background**

9.      Huron had a SaaS Agreement with the Hospital through its acquisition of the Studer Group, in 2021 and 2022.

10.     In 2022, Huron sought to expand its scope of work for the Hospital.

11.     On or about September 9, 2022, Huron presented to then CEO, Perry Gay, a proposed contract, referred to therein as an Engagement Letter, to provide consulting services to the Hospital for an operations review. A true and correct copy of the contract is attached as **Exhibit 1**. ("Engagement Letter") The Engagement Letter consisted primarily of boilerplate ideas that favored Huron and attempted to provide Huron with broad control and power over systems and processes of the Hospital.

12.     As an expert in the health care industry, Huron knew, or should have known, that, to be enforceable, the Engagement Letter was required to be submitted to the Governing Board for approval, and that certain terms and conditions of the Engagement Letter must comply with the law and public policy of the State of Indiana.

13.    In fact, the Engagement Letter was never presented to the Governing Board, and the Governing Board never approved any terms and conditions pursuant to which Huron could provide consulting services to the Hospital pursuant to the Engagement Letter.

14.    The Governing Board also never delegated to CEO Gay its power and authority to determine the reasonable terms and conditions pursuant to which the Hospital would contract with Huron**.** To the contrary, Gay was required to comply with Indiana law and was prohibited from engaging the services of consultants without board approval.

15.     Instead of presenting the Engagement Letter to the Governing Board, Huron began to work directly with CEO Gay.

16.    The Engagement Letter first required Huron to conduct a review of Hospital procedures and to make the assessments.  It would then propose changes to the Hospital and would implement changes and procedures as agreed to by the Hospital.

17.    The Engagement Letter provided that Huron would be compensated for its efforts as follows:

A.    Huron would be paid fixed fees as set forth in the Engagement Letter for its assessment and implementation efforts.  Despite never obtaining approval from the Governing Board, CEO Gay directed payment to Huron for its work.  Huron was paid for most, but not all, of the fixed fees set forth in the Engagement Letter.

B.    Huron would be earning contingent fees under the Engagement Letter based upon a methodology used to determine the successful implementation of Huron's proposals.  The methodology and contingent fees were required to be negotiated by Huron and the Hospital within sixty

(60) days of the Engagement Letter, and then would be incorporated into the Engagement Letter as Exhibit B before any implementation commenced.   Huron and the Hospital never completed the negotiation of Exhibit B.

C.   Huron would also be paid its reasonable, out of pocket expenses. Huron was paid most, but not all, of its expenses under the direction of CEO Gay, who directed payment to Huron for its work.

18.   The Engagement Letter also contained a termination schedule by which Huron would receive a penalty payment up to five million dollars ($5,000,000) by the Hospital if the Engagement Letter was terminated before Huron deemed its work under the Engagement Letter to be complete.

19.   Separate from the work performed under the Engagement Letter, CEO Gay engaged with Huron to perform consulting services for the Hospital related to financial issues facing the Hospital.  One service involved the review of revenue cycles and other related financial issues to assist in the preparation of a 2023 Operating Budget. Although Huron's work on these issues was unrealistic, contrary to the best interests of the Hospital, and not beneficial to the Hospital, CEO Gay directed payment to Huron for all of its work.

20.   Also separate from the Engagement letter, CEO Gay engaged with Huron to work on bond refinancing pursuant to which Huron would be paid contingent upon a transaction closing.  These efforts also failed, and no transaction was completed.

21.   Although some information about Huron was presented to the Governing Board, most of the details and the agreements, including the Engagement Letter, were concealed from the Governing Board.  Only when Huron began presenting its proposals to the Governing Board

did the board become aware of Huron's activities and begin to investigate how Huron was engaged and how it was being paid.  It was discovered that none of the engagements, including the Engagement Letter, were ever presented to the Governing Board.

22.     Upon discovering the Engagement Letter, it became apparent that the terms and conditions would never have been approved by the Governing Board.  However, The Governing Board learned that Exhibit B, a critical part of the Engagement Letter, was yet to be negotiated, and that no implementation would be agreed to or performed until Exhibit B was finalized. Therefore, on January 23, 2023, the Governing Board passed a Resolution to create an express policy that limited the CEO to contracts of less than $100,000 and required any contract with a greater value to be approved by the Governing Board.  This ensured that Gay and Huron would not agree on Exhibit B without Govering Board approval. After that point, Huron stopped sharing any information with the Governing Board about its activities under the Engagement Letter.

23.     On January 24, 2023, Huron finally submitted its version of Exhibit B to the Hospital. It was completely unreasonable and was never agreed to by the Hospital.  .

24.     Huron's activity at the Hospital had been more disruptive than helpful to the Hospital operations and its financial processes. It appeared to the Hospital staff that Huron had little familiarity with or concern for the delivery of quality health care and was only concerned about its initiatives. Huron provided little, if any, positive value to the Hospital.

25.     On March 22, 2023, Perry Gay resigned as CEO of the Hospital and was replaced on an interim basis with David Ameen.

26.     The Hospital informed Huron that it did not consider the Engagement Letter to be a valid and binding agreement because it had never been approved by the Governing Board. The

Hospital also reminded Huron that Exhibit B had not been timely submitted and had never been agreed to by the Hospital.

27.     The Hospital was willing to negotiate a consulting services agreement with Huron on a fixed fee basis, but the parties never reached an agreement. Huron continued to demand payment for questionable work, but the Hospital did not believe that it owed additional compensation to Huron. It appeared to the Hospital that Huron was more concerned with its compensation structure than providing solutions to the Hospital.

28.     On April 17, 2023, Huron sent correspondence to the Hospital that the Hospital was in breach of the proposed contract because the Hospital did not pay Huron the full amount demanded under the Engagement Letter.

29.     When the Hospital did not pay Huron pursuant to its demand, on May 23, 2023, Huron sent a letter terminating the Engagement Letter and demanding a termination fee of $4,375,000, plus unpaid expenses in the amount of $84,658.84. No invoice was submitted at that time and no back up documentation was provided for the expenses. Nonetheless, Huron demanded payment within seven (7) days of its letter. Huron sent notice of its termination of the Engagement Letter in retaliation against the Hospital and so that it could claim windfall profits.

30.     The Hospital disputes that the Engagement Letter, especially some specific terms and conditions, are valid and enforceable under Indiana Law, and it disputes that it owes any additional amounts to Huron. Therefore, a current genuine dispute exists between the Hospital and Huron.

31.     All conditions precedent to the prosecution of this action had been performed, have occurred, or have been excused or waived.

**Count I**

32.     The Hospital incorporates the allegations of paragraphs 1-31 into Count I.

33.     The Engagement Letter is not a valid and enforceable contract because the Governing Board of the Hospital never approved the terms and conditions as reasonable in compliance with Indiana Code § 16-22-2-6.

34.      The Engagement Letter is not a valid and enforceable contract because Perry Gay also did not have the power and authority to bind the Hospital without the approval of the Governing Board.

35.     The Engagement Letter is not a valid and enforceable contract because it contains an unreasonable termination schedule which constitutes a penalty against the county Hospital, tantamount to punitive damages for allegedly breaching the Engagement Letter. Thus, the proposed agreement as a whole, and the termination schedule specifically, is void as against public policy.

36.     The Engagement Letter is not a valid and enforceable contract because, even if valid, Huron breached the proposed contract first by failing to submit Exhibit B in a timely manner, among other conduct.

**WHEREFORE**, for any one or all of the reasons set forth above in this Count, the Hospital requests that the Court declare the Engagement Letter as void and unenforceable against the Hospital.

**Count II**

37.      The Hospital incorporates the allegations of paragraphs 1-36 into Count II.

38.     Huron continues to demand additional payment for services that it allegedly performed for the Hospital as well as a windfall penalty for termination of the Engagement Letter.

39.     The Hospital should not be required to pay for any alleged service because Huron was attempting to implement processes and systems that the Hospital did not need or want.

40.     The Hospital should not be required to pay for any alleged service because Huron was providing substandard work and work that provided little, if any, benefit to the Hospital.

41.     The Hospital should not be required to pay the termination payment being demanded by Huron because Huron wrongfully terminated the Engagement Letter in retaliation against the Hospital for refusing to agree with the unreasonable terms in conditions in Exhibit B and wanted to claim a windfall profit, tantamount to punitive damages for the Hospital's allege breach of the Engagement Letter.

**WHEREFORE** the Hospital requests that the Court enter a declaratory judgment in its favor against Huron, finding that the Hospital does not owe additional payments to Huron for any work allegedly performed by Huron for the Hospital under the Engagement Letter.

### Count III

42.     The Hospital incorporates the allegations of paragraphs 1-41 into Count III.

43.     Huron has threatened to pursue arbitration as provided for in the Engagement Letter.

44.     The Hospital contends that the arbitration provision is not enforceable because the Engagement Letter is void and enforceable.

45.     The Hospital contends that this Court is the best and only forum to determine the validity and enforceability of the Engagement Letter and the public policy of Indiana regarding

the enforcement of the Engagement Letter and the termination provision that is tantamount to punitive damages against a municipally owned hospital.

46.     The Hospital will suffer prejudice and be irreparably harmed if it is required to arbitrate under the Engagement Letter that is void and unenforceable.

47.     No harm will result to Huron if this Court is the forum where the validity and enforceability of the Engagement Letter is decided.

48.     Public policy favors a judicial determination about the enforceability of the Engagement Letter under Indiana statutes and public policy.

**WHEREFORE** the Hospital requests that the Court enter an injunction against Huron from filing or taking any steps to pursue an arbitration under the Engagement Letter until after a final and binding declaratory judgment is entered relating to the validity and enforceability of the Engagement Letter, and for all other just relief.

Respectfully submitted,

*/s/ Michael A. Wukmer*
Michael A. Wukmer, Atty. No. 2223-49
Angela Rinehart, Atty. No. 34753-49
ICE MILLER LLP
One American Square, Suite 2900
Indianapolis, IN 46282-0200
Telephone: 317-236-2100
Michael.Wukmer@icemiller.com
Angela.Rinehart@icemiller.com

*/s/Jeffrey D. Stanton*
Jeffrey D. Stanton , Atty No. 16204-55
216 Fourth Street
Logansport, Indiana 46947
Telephone: (574) 722-2535
jstanton@jeffreystanton.com

*Attorneys for Plaintiff Logansport Memorial Hospital*

09D02-2309-PL-000029

Filed: 9/18/2023 4:58 PM
Clerk
Cass County, Indiana

# Exhibit 1

DocuSign Envelope ID: 68D09566-A833-4B2D-9DC9-4BCDC8DED7EC



# HURON

September 9, 2022

Mr. Perry Gay
Chief Executive Officer
Logansport Memorial Hospital
1101 Michigan Avenue
Logansport, IN 46947

Dear Mr. Gay:

Huron Consulting Services LLC ("Huron") appreciates the opportunity to assist Logansport Memorial Hospital ("LMH" or "you" or "your") with your efforts to improve operational performance. This Engagement Letter documents the mutual agreement of the parties with respect to the services Huron will provide to LMH (the "Project").

## **Project Scope and Approach**

Huron will work with LMH to assess the areas of focus listed below, identify and prioritize opportunities for performance and debt structure improvement and implement Huron's solutions for those areas of scope determined to have sufficient return on investment by the parties at the Project Checkpoint, as defined below. Assessment related scope is as follows:

- Revenue Cycle
  - o Assess LMH hospital revenue cycle performance to identify opportunities to improve revenue yield and cash collections through a combination of executive and operational leadership interviews, data analytics, and key performance indicator benchmarking.

- Supply Chain (Non-Labor Spend)
  - o Review LMH's data to assess cost reduction opportunities across pricing, utilization, and standardization of supplies and services for the following focus areas:
    - Clinical supplies and physician preference items (PPI)
    - Non-clinical supplies
    - Laboratory services
    - Purchased and support services.

- Workforce
  - o Identify opportunities in cost and workforce efficiency management across all departments through:
    - Internal and external benchmarking.
    - Organizational span of control evaluation.
    - Regression analysis.
    - Workforce management playbook gap analysis, which evaluates LMH performance against best-practice workforce management techniques.

- Debt Structure
  - o Assess LMH's existing debt to identify opportunities to:
    - Refinance debt with new lenders or renegotiate terms with the existing lenders
    - Fund future capital needs and strategic initiatives
    - Reduce the overall cost of capital and
    - Restructure debt to reduce near term principal amortizations

Confidential – for internal use of LMH only

1

DocuSign Envelope ID: 68D09566-A833-4B2D-9DC9-4BCDC8DED7EC

- Pharmacy
  - Review pharmacy purchasing to identify trends for improvement, cost reduction, and alternative therapeutic opportunities.
  - Review 340B Drug Program activities, including but not limited to drug purchasing patterns, outpatient retail pharmacy opportunities, and evaluation of non-hospital-based departments for possible realignment in order to decrease expenditures and increase revenues.
  - High-level review of employee prescription benefits to determine opportunities for cost reduction.
- Clinical Documentation Improvement ("CDI")
  - Assess inpatient discharge data to identify clinical documentation and coding opportunities that accurately reflect the severity and complexity of services provided, appropriate Case Mix Index (CMI), and accurate reimbursement.
- Managed Care
  - Review managed care payor hospital yields for all fiscal intermediaries (through zero-balance account reviews) and value-based performance against contracted performance goals.
- Human Resources (Total Rewards)
  - High-level total rewards policy review, including:
    - Benefits (e.g., medical, dental, vision, other ancillary benefits)
    - Premium Pay (e.g., overtime, shift differentials, on-call/call-back, extra shift incentives)
    - Time Away from Work (e.g., PTO/Vacation accruals, cash-out provisions, holidays)
- Medical Group
  - Review patient access to care and identify opportunities to increase ease of access and optimize resource utilization.
  - Opportunities could span provider productivity, inbound/outbound referral management approach and supporting technology, provider care team approach, provider/ancillary utilization and coordination, scheduling processes and procedures, templates, resource utilization data, practice leadership, and patient experience.
- Clinical Effectiveness/Perioperative
  - Evaluate current performance compared to industry-leading practices and identify improvement opportunities focused on patient throughput, perioperative services, and access to care across the care continuum (i.e., inpatient units, portals of entry, clinics/referral networks).
  - Opportunities could span length of stay management, quality and safety, perioperative flow, care variation management, utilization management, and post-acute placement needs.
- Cultural Health
  - Use Huron's proprietary survey that highlights relative areas of opportunity to advance your change leadership approach, drive successful transformation, and develop a customized change management plan that builds on your current strengths, uncovers barriers, and mitigates risk that may impact speed to implementation.
- Information Technology
  - Evaluate use of technology, including Cerner, across LMH by:
    - Reviewing LMH's use of Cerner in many of the functions above, identifying issues with the Cerner configuration and opportunities to better leverage existing, available Cerner functionality and features.

Confidential – for internal use of LMH only

2

DocuSign Envelope ID: 68D09566-A833-4B2D-9DC9-4BCDC8DED7EC

- Benchmarking IT spend and staffing against both industry standards and similar organizations to determine over or under allocations of either.
- Completing application and infrastructure rationalization to identify configuration issues and seek opportunities to optimize Cerner features and functionality.

Areas included in immediate implementation are Revenue Cycle, Workforce and Supply Chain. Specific scope, tasks and activities for immediate implementation are as follows:

*Immediate Implementation:*

Huron, in collaboration with LMH will begin implementing initiatives in the following areas of focus. The implementation initiatives will include the following:

**Revenue Cycle (Hospital-Based Services)**
- Restructure critical revenue cycle functions to streamline workflows, eliminate redundancies, and reduce delays within and between departments.
- Establish consistent processes, tools, and reporting to reduce handoffs and improve oversight of operations.
  - Depending on initial assessment findings, determine if Huron's Revenue Cycle Performance Accelerators (RCPA – enhanced workflow and reporting) would be needed to drive targeted benefit levels. If needed, these RCPA tools would sit on top of CommunityWorks, and we would collaborate with LMH to evaluate and consider CommunityWorks optimization opportunities.
- Implement a comprehensive accounts receivable (AR) strategy to address all AR segments in an effective manner.
- Evaluate and modify existing meeting and accountability structures to better focus leaders on the appropriate level of detail for their areas of responsibility.
- Implement a denials task force including meeting structure, attendees, roles and responsibilities, and reporting key performance metrics to effectively manage and prevent denials.
- Complete a staffing analysis for key revenue cycle areas to identify resource shortages or excess.
  - Align staff for operational efficiency and remove barriers to ineffective operations.
- Where applicable, engage new vendors for defined populations, renegotiate vendor contracts and/or scope, and eliminate vendors and use in-house staff to work specific account populations.

**Workforce**
- Develop a workforce operating model through leveraging the leading practice workforce management playbook developed by Huron.
- Develop customized principles around leading practice workforce management tools, techniques, and practices to decrease your labor expense.
- Implement governance structure, specifically a Labor Variance Committee, to monitor performance-to-productivity expectations.
- Implement or refine governance structure for position request and approval process.
- Enhance and standardize foundational workforce management infrastructure and tools such as core staffing, flexing policies, and productivity management education materials.
- Provide recommendations for core staffing so appropriate levels of staffing are available at key times and based on historical demand.
- Implement Huron's labor productivity tracker tool to monitor staff productivity.

**Supply Chain (Non-Personnel Spend)**

Confidential – for internal use of LMH only

DocuSign Envelope ID: 68D09566-A833-4B2D-9DC9-4BCDC8DED7EC

- Finalize contract document review to understand total contract value, including rebate structures, market share commitments, etc., for each identified initiative.
- Implement supply chain benefit tracking tools.
- Establish opportunity initiative workplans categorized by clinical, physician preferences, non-clinical, purchased services, and support services to communicate with LMH internal stakeholders and vendors effectively during implementation process.
- Complete vendor RFP/RFQ and negotiations.
- Work with appropriate LMH staff after vendor negotiations are complete to confirm pricing is loaded and new prices are implemented.
- Develop clinician buy-in strategy and assign physician champion to each physician preference initiative.
- Design sustainability measures to hardwire your capability and maintain your gains
  - Evaluate and refine value analysis teams, align with service lines (e.g., OR, Cath Lab, Nursing, etc.) and create formal supply chain governance structure
  - Finalize sourcing strategy that maximizes benefit for each initiative and that guides your contracting and sourcing guidelines
  - Refine/establish performance reports

**Debt Structure**

If the LMH elects to issue municipal securities following the Debt Structure assessment, Huron Public Finance Advisory LLC ("HPFA") will structure a separate engagement agreement with LMH that includes additional services and fees as LMH's municipal advisor. At this time, HPFA is not acting municipal advisor, financial advisor or fiduciary to any borrower or any other person or entity. The services provided are not intended to be, and should not be construed as, "advice" within the meaning of Section 15B of the Securities Exchange Act of 1934 ("the Exchange Act") and the applicable rules promulgated thereunder.

LMH will designate one member of its senior management team to be the executive sponsor for this Project. This individual, typically the CEO, COO, or CFO, will be responsible for the Project and should have the organizational authority to assemble and guide the necessary resources within the organization to ensure satisfactory support of the Project.

LMH will establish a Project Steering Committee to oversee the Project. Typically, the Committee is comprised of key members of senior management and, if appropriate, key physicians or Board members. Huron will work with leadership to determine the appropriate configuration for LMH. At the start of the Project, Huron will conduct a kick-off meeting with the Steering Committee to review the Project approach, methodology, and timetable. The Project Steering Committee will meet on a regular basis with Huron Project management to review Project status, oversee the Project and resolve open issues.

The Project will begin with a request for information ("RFI"). The RFI will request key financial and operational reporting, information about LMH environment and organization, and detailed data extracts as required to perform Huron's analyses. Huron will review the data requests with the executive sponsor and designee(s) to determine who, within LMH, will be collecting the various data components. In advance of the data collection effort, Huron will review the specific data requests with these individuals to ensure what is being requested is clearly understood and to determine how best to obtain the required information.

The parties will also launch the Project with a kick-off meeting(s) and develop communication plan to inform key stakeholders of Project progress. Huron will work with the executive sponsor to identify point

Confidential – for internal use of LMH only

DocuSign Envelope ID: 68D09566-A833-4B2D-9DC9-4BCDC8DED7EC

people within LMH to help facilitate discovery requirements (e.g., collecting data, scheduling interviews) and to obtain required system access and establish logistics, as necessary.

**Project Activities**

*Assessment*

Huron will work with LMH on the following activities during the assessment discovery phase of the Project:

- Launch assessment and establish Project Management Office ("PMO")
- Distribute cultural health survey
- Analyze data using information from data request to identify, confirm, and/or quantify potential improvement opportunities. Review existing reports, dashboards, and metrics to understand LMH's current financial and operational performance.
- Conduct interviews with selected key executive stakeholders to learn about daily operations, resourcing, workflow, productivity, tools, reporting, and performance. Discuss strengths and challenges of current operating methods and perceived improvement opportunities.
- Use information gathered through interviews in conjunction with comparative analyses to identify, quantify and prioritize financial opportunities for LMH.
- Develop recommendations for prioritized implementation opportunities
- Prioritize and begin implementation of opportunities to drive immediate benefit in revenue realization, cost reduction and process improvements.
- Establish baselines and improvement goals to support ongoing management and improvement measurement.
- Summarize in-flight initiatives with LMH leaders and executive team members. Quantify any updated benefit projections from immediate improvement opportunities.
- Present prioritized discovery findings for implementation .

*Project Checkpoint:*

The parties will meet 60 days after the start of the Project (the Checkpoint) to review detailed findings and finalize a list of implementation initiatives prioritized by level of financial impact and informed by LMH capacity for change.  During the Project Checkpoint, LMH will receive the following deliverables across each scope area listed above to help verify priorities, finalize work teams, and set timelines and targets:

- Communication plan
- Cultural health survey results and recommendations
- Executive interview observations/findings
- Interview and relevant observation findings
- Additional requests for information (RFI) as needed for implementation activities
- Benefit achievement tracker of immediate implementation initiatives
- Implementation road map of categorized and prioritized initiative recommendations
- Process recommendations

The parties will execute an amendment to this Engagement Letter detailing the scope, activities, deliverables and fee arrangements for areas to be pursued in implementation as determined during the Project Checkpoint.

Huron will not be auditing any financial statements or performing attest procedures with respect to information in conjunction with this engagement.  Huron's services are not designed, nor should they be

Confidential – for internal use of LMH only

DocuSign Envelope ID: 68D09566-A833-4B2D-9DC9-4BCDC8DED7EC

relied upon, to disclose weaknesses in internal controls, financial statement errors, irregularities, illegal acts, or disclosure deficiencies.

Services provided by Huron under this Engagement Letter shall not include, and LMH shall not request, any service which may be considered the practice of medicine under any applicable laws or regulations, or the provision of direct or indirect patient care by any Huron personnel.  LMH shall be responsible for reviewing and approving recommended changes to work processes, tools, and techniques prior to implementation.

LMH acknowledges that Huron is not responsible for independently verifying the truth or accuracy of any information supplied to Huron by or on behalf of LMH.  In all of Huron's work performing the Services, the activities, conclusions, strategies and recommendations that Huron develops and implements represent Huron's experienced judgment, based on the information supplied to Huron.  LMH is responsible for reviewing and approving all work suggested, provided, or undertaken by Huron.

**Additional LMH Project Obligations**

An implementation of Huron's performance improvement solutions requires contributions of both parties. Much of this Project Arrangement Letter describes Huron obligations, but LMH also has obligations in order to support effective implementation.  LMH will make reasonable efforts to:

- Ensure LMH leadership, management and supervisors proactively support the goals of the Project and the execution and activities that are approved by the respective Program Steering Committees.
- Quickly incorporate reasonable time sensitive items that allow Program benefits to be acquired.
- Comply with all of Huron's reasonable requests and provide Huron with timely access to all information and locations reasonably necessary to the performance of the Project.
- Approach the Project from a LMH-wide perspective, decisively selecting options and approving recommendations.
- Provide executive involvement and leadership to the Project, including:
  - Attendance, participation and leadership at the Executive Steering Committee and various Program Steering Committees
  - Attendance, participation and leadership in the various Program working groups
  - Active support of meeting overall Project targets and targets of the various Program working groups
  - Providing a safe environment for the staff to take risks and try new things
  - Requesting and supporting physician involvement and leadership as necessary
  - Focusing on implementation of savings
- Hold executive sponsors and working group leads accountable for exceeding targets and take action if a working group is not meeting targets.  LMH will support the improvement process in good faith, including not engaging in "end-arounds" to the executive team and not revoking earlier decisions.
- Ensure senior management actively supports all savings initiatives once approved by the appropriate Program Steering Committee and in good faith considers for implementation all savings initiatives that will result in bottom line impact and not negatively impact quality or service levels.
- Include performance improvement goals in management goals, if possible.
- Ensure appropriate staffing of working groups, with personnel who have knowledge of the Program scope.
- Ensure that the Project is viewed by physicians and staff as an LMH initiative that has full support of the executive and medical staff leadership.

Confidential – for internal use of LMH only

DocuSign Envelope ID: 68D09566-A833-4B2D-9DC9-4BCDC8DED7EC

- Assist in scheduling and coordinating all interviews and observations reasonably requested by Huron.

**Project Governance**

While developing the Executive Steering Committee. Huron and LMH will establish a project governance structure, with one Huron Lead and one LMH Lead for each area of focus working side-by-side, to enable LMH and Huron to work closely with one another and create a customized list of implementation initiatives that drive the most financial benefit for your organization. As a part of this governance structure, throughout assessment and implementation, Huron will also evaluate your cultural readiness for change, and provide you with the change management support you need to enable true transformation.

**Project Schedule**

Upon execution of this Engagement Letter, Huron will work with LMH to confirm the timeline of this Project. The duration of the Project is dependent upon the ability to obtain information from LMH, schedule interviews, coordinate project logistics, etc. on a timely basis, as well as the scope of implementation determined during the Project Checkpoint. This Project is expected to have a duration of 8-10 months.

Huron will provide the services for this Project both onsite and remotely as determined most appropriate by Huron and LMH.  During remote provision of services, Huron personnel will be available via phone, email, video conferencing, and other communications.  For onsite activities, Huron will work with you to arrange Project team workspace, networking, and other logistics, as appropriate.  Huron anticipates a ramp up of the Project team during the early stages of the Project and a corresponding ramp down during the later stages of the Project.

**Project Fees and Expenses**

The professional fees for this Project consist of both fixed and contingent fees.

*Fixed Fees*

The Fixed Fees are $450,000 and will be paid in accordance with the following payment schedule:

| Payment Date | Payment Amount |
| --- | --- |
| October 15, 2022 | $25,000 |
| November 15, 2022 | 25,000 |
| December 15, 2022 | 25,000 |
| January 15, 2023 | 50,000 |
| February 15, 2023 | 50,000 |
| March 15, 2023 | 50,000 |
| April 15, 2023 | 75,000 |
| May 15, 2023 | 75,000 |
| June 15, 2023 | 75,000 |

7

Confidential – for internal use of LMH only

DocuSign Envelope ID: 68D09566-A833-4B2D-9DC9-4BCDC8DED7EC



| TOTAL FEES | $450,000 |
|---|---|

*Contingent Fees*

Contingent fees for the Project will be calculated by multiplying cost reduction, revenue enhancing, and cash flow improvement benefits, as determined by the approved Benefit Measurement methodology described below, by a factor of 25%.

Following the assessment of LMH's Debt Structure, if LMH elects to proceed a transaction that includes the issuance of municipal securities with HPFA as its municipal advisor, it acknowledges it has agreed to a preliminary fee of 1.9% of future bond proceeds, or a minimum fee of $500,000.

Huron will bill Recurring Benefit Contingent Fees monthly, in the month following which they are earned. Payment by LMH of each invoice for Contingent Fees shall be deemed to constitute LMH's agreement with the calculation of Contingent Fees, including the selection and measurement of the factors that are used to determine Contingent Fees.

*Benefit Measurement*

Within the first sixty (60) days of the Project or such extended period as mutually agreed upon by the Parties, the parties will work together in good faith to agree to a methodology for measurement of benefit from the Project and execute an Exhibit B to the Engagement Letter documenting their agreement and describing the benefit measurement methodology.

All improvement initiatives implemented or identified for implementation from the outset of the timeframe utilized for the initial calculation of the baseline measurements through the completion of the Project for which Huron is approved in writing by Project Sponsor to provide implementation assistance are considered part of the Project ("In Scope") and will be included in the calculation of the Project benefits in accordance with Exhibit B, subject to the measurement confirmation requirements set forth therein. Initiatives that LGH has identified, implemented, and confirmed independently before Project start will be considered "Out of Scope" and will not be included in Project benefits or will be considered and utilized to adjust the benefit measurement baseline, if the overall area is to remain within implementation scope. If applicable, a listing of additional "Out of Scope" initiatives will be agreed upon between LGH and Huron within the first four (4) weeks of the initiation of the Project. Initiatives not specifically identified as Out of Scope will be considered eligible for Huron to recommend improvement initiatives to be In Scope, subject to written approval of the Project Sponsor, and will be included in the Project benefits, if approved. If at the written request of MHG, Huron provides implementation assistance for a previously Out of Scope initiative, that initiative will be considered to be In Scope and the net benefits associated with that initiative will be included in the Project benefits.

*Expenses*

Huron will also bill for reasonable, actual out-of-pocket expenses ("Expenses"), incurred for the Project and will conduct much of the work remotely in an effort to minimize Expenses. Expenses include items such as airfare, ground transportation, lodging, and usual and customary per diems. The Expenses will be invoiced monthly for actual Expenses incurred. All fees and Expenses paid by LMH are non-refundable.

**Project Termination**

In the event the Project is terminated prior to completion for other than Huron's breach, LMH shall pay the greater of the Project Termination Fees as set forth below in the **Project Termination Fees Schedule** or the sum of the total fees owed to date of termination. These fees set forth in **Project Termination Fees Schedule** represent the work and effort provided by Huron to the date of termination (**"True Up Total"**). If the Fees paid by LMH are less than the True-Up Total, LMH shall pay any difference to

8

Confidential – for internal use of LMH only

DocuSign Envelope ID: 68D09566-A833-4B2D-9DC9-4BCDC8DED7EC

Huron.  In the event the termination date was before the last day of the month, the Project Termination Fee for that month would be prorated according to the calendar days of the month.  LMH would also pay Huron for reimbursement of any Expenses it incurred through the termination date.

| Termination Schedule | |
|---|---|
| **Termination Up to** | **Amount Due** |
| October 15, 2022 | $500,000 |
| November 15, 2022 | $1,000,000 |
| December 15, 2022 | $1,750,000 |
| January 15, 2023 | $2,500,000 |
| February 15, 2023 | $3,250,000 |
| March 15, 2023 | $3,750,000 |
| April 15, 2023 | $4,250,000 |
| May 15, 2023 | $4,500,000 |
| June 15, 2023 | $4,750,000 |
| July 15, 2023 | $5,000,000 |

**General Business Terms**

The terms and conditions of a Business Associate Agreement will govern Huron's use and disclosure of LMH's protected health information.

The General Business Terms included as Attachment A are incorporated into and made a part of this Engagement Letter.

This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior representations, agreements, and understandings, written or oral.

Execution and delivery of this Project Arrangement Letter and any amendments by the parties shall be considered legally valid and effective if executed or adopted by a party through use of an electronic process (i.e., "electronic signature" through a process such as DocuSign®).

The undersigned parties agree to the terms, conditions and fees described in the foregoing letter.

LOGANSPORT MEMORIAL HOSPITAL                    HURON CONSULTING SERVICES LLC

By: _____                   By: _____
     Perry Gay, CEO                                    James G. Gallas, Managing Director

Attachments:     Attachment A – General Business Terms

9

Confidential – for internal use of LMH only

DocuSign Envelope ID: 68D09566-A833-4B2D-9DC9-4BCDC8DED7EC

**Attachment A to Engagement Letter between Huron Consulting Services LLC ("Service Provider") and Logansport Memorial Hospital ("Client"), each a "Party", and collectively the "Parties".**

**GENERAL BUSINESS TERMS**

These General Business Terms, together with the Statement of Work (including any and all attachments, exhibits and schedules) constitute the entire understanding and agreement (the "Agreement") between the parties with respect to the services and deliverables described in the Statement of Work. If there is a conflict between these General Business Terms and the terms of the Statement of Work, these General Business Terms will govern, except to the extent the Statement of Work explicitly refers to the conflicting term herein. The term "Statement of Work" (or "SOW") will also include a Project Arrangement Letter or Engagement Letter that incorporates these General Business Terms.

**1. Services.** (a) Service Provider will provide the services and furnish the deliverables (the "Services") as described in the Statement of Work and any attachments thereto, as may be modified from time to time by mutual consent

(b) Service Provider will not perform any Services that may be considered the practice of medicine or nursing or provision of patient care under any applicable laws or regulations. To the extent Services include clinical process recommendations, Client will provide medically appropriate standards that may be referenced by the Service Provider in such recommendations.

(c) To the extent Service Provider assists in the preparation of a financial analysis, such analysis is solely for use by Client management for internal purposes. Services are not designed, nor should they be relied upon, to disclose weaknesses in internal controls, financial statement errors, irregularities, illegal acts, or disclosure deficiencies. Any financial or other model that Service Provider creates as part of the Services will be unique to this engagement, based on specific circumstances and assumptions, and may not be appropriate for use when those circumstances and assumptions change. Financial analyses and similar Service Provider Materials may not be shared with any third party without Service Provider's prior written consent and may be used only for those purposes expressly described in the SOW.

(d) Service Provider is not responsible for identifying Client's violations of laws or regulations.

(e) Service Provider is not a law firm and is not authorized to provide legal advice or counseling in any jurisdiction. Services are not designed, nor should they be relied upon, to provide legal recommendations. The information provided by Service Provider is not substitute for the advice of legal, human resources, or other applicable professionals.

**2. Intellectual Property Rights.** (a) By providing Service Provider copies of or access to Client Data in connection with this Agreement, Client grants Service Provider the right to use and reproduce such Client Data for the sole, limited purpose of performing the Services under this Agreement; *provided,* that Client retains all ownership rights to such Client Data. For purposes of this Agreement, "Client Data" is broadly defined to include all proprietary data, content, or Confidential Information about Client that is provided to Service Provider for purposes of performing the Services under the SOW.

(b) By providing Client copies of or access to Service Provider Materials in connection with the SOW, Service Provider grants Client the right to use such Service Provider Materials for Client's own internal use for the purposes for which such Service Provider Materials are provided, subject to any scope limitations identified in the SOW; *provided,* that Service Provider retains all ownership rights to such Service Provider Materials. For purposes of this Agreement, the term "Service Provider Materials" is broadly defined to include anything Client receives from Service Provider or its agents in performance of the Services, including without limitation Service Provider's proprietary intellectual property and materials (whether or not registerable as a copyright, trademark, or patent), know-how, software (and any modifications, configurations, or enhancements thereof), and trade secrets, but specifically excluding any Client Data to the extent incorporated in the Service Provider Materials.

Confidential – for internal use of LMH only

10

DocuSign Envelope ID: 68D09566-A833-4B2D-9DC9-4BCDC8DED7EC

(c)  The rights of use granted under this Section 2 specifically include the right to create derivative works; *provided,* that such derivative works are subject to the same ownership rights, limitations on scope and permitted purposes as applicable to the original work.

(d)  Except as otherwise provided under Sections 11(d) and 12(b)(iv), the rights granted under this Section 2 will survive expiration or termination of the SOW.

**3. Fees.**  (a) Client will pay Service Provider the fees and allowable incurred expenses within 30 days of receipt of an invoice. Such payment will be made via ACH, EHT, or check, in accordance with the terms of the SOW.  All amounts that are past due will be subject to a monthly charge of one and one-half percent (1.5%) per month or the maximum rate permitted by the law, whichever is less.

(b) Client will pay all applicable sales, use, excise, value added, services, consumption and other taxes and duties associated with Client's receipt of the Services and Service Provider Materials, excluding taxes on Service Provider's income generally.   Client will provide Service Provider with a copy of Client's certificate of tax exemption, if applicable.

(c) In the event Client requires Service Provider personnel to be physically located on site for a "long-term basis," as defined by the IRS, Client will pay an incremental additional fee in the amount required to gross up such personnel's income to ensure tax neutrality, or at Client's request, the parties can agree to substitute personnel as necessary and available.

(d) If Client requires Service Provider to contract with a third-party vendor to facilitate performance of this Agreement, Client will be responsible for all costs associated with such vendors, unless otherwise agreed by the parties in the SOW.

**4. Client Responsibilities.** (a) In order for Service Provider to perform the Services and provide the Service Provider Materials, Client is responsible for the following: (i) accommodating Service Provider with appropriate work space and customary facilities as needed for on-site Services; (ii) ensuring relevant personnel provide full and active support to Service Provider; (iii) providing accurate and complete information upon which Service Provider will rely; (iv) performing Client's own independent review of any third party vendors, services, products, and proposals;  and (v) fulfilling such other responsibilities as may be set forth in the SOW.

(b) The activities, conclusions, strategies, suggestions, and recommendations that Service Provider develops and implements represent Service Provider's experienced judgment based on the information provided to Service Provider. Client acknowledges that Services are consultative in nature and are offered as suggestions subject to Client's approval. Client is responsible for, without limitation: (a) vetting any third party vendor introduced by Service Provider; Service Provider makes no endorsement  of such vendor's services or products, (b) reviewing and approving all work suggested, provided, or undertaken by Service Provider, (c) verifying and determining whether to act on Service Provider's suggestions regarding Client's employees or contactors, and (d) using all Services provided by Service Provider in a manner consistent with all applicable requirements, rules, regulations and laws, including, if applicable, all payer requirements. Client will indemnify and hold harmless Service Provider for any third party claim relating to Client's responsibilities above.

**5. Warranty.** (a) Service Provider warrants that the Services will be performed with reasonable care in a diligent and competent manner consistent with industry standards. Should the Services not conform to this warranty, Client must notify Service Provider in writing, within ten (10) days after the Services are performed, specifying the non-conformance in detail. Service Provider will have a reasonable amount of time to correct the non-conformance based on its severity or complexity.

(b)  If applicable to the Client receiving Services pursuant to the SOW, Service Provider warrants that neither it nor its personnel providing Services is excluded from any federally funded healthcare programs as provided in Sections 1128 and 1128A of the Social Security Act (42 U.S.C. 1320a-7a), including

Confidential – for internal use of LMH only

11

DocuSign Envelope ID: 68D09566-A833-4B2D-9DC9-4BCDC8DED7EC

Medicare and Medicaid. Service Provider will notify Client promptly in the event Service Provider, or any of its personnel or agents performing Services for Client, becomes excluded from any federally funded healthcare programs.

(c) THE WARRANTY SET FORTH IN THIS SECTION IS SERVICE PROVIDER'S ONLY WARRANTY CONCERNING THE SERVICES AND ANY SERVICE PROVIDER MATERIALS AND IS MADE EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES AND REPRESENTATIONS, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE, OR OTHERWISE, ALL OF WHICH ARE HEREBY DISCLAIMED.  SERVICE PROVIDER DOES NOT WARRANT AND IS NOT RESPONSIBLE FOR ANY THIRD-PARTY PRODUCTS OR SERVICES THAT MAY BE OFFERED IN CONJUNCTION WITH THIS AGREEMENT. CLIENT'S SOLE AND EXCLUSIVE RIGHTS AND REMEDIES WITH RESPECT TO ANY THIRD-PARTY PRODUCTS OR SERVICES ARE AGAINST THE THIRD PARTY AND NOT AGAINST SERVICE PROVIDER.

**6. Confidentiality.** (a) To fulfill the obligations hereunder, each party may have access to the other party's information and materials that are confidential and proprietary or should reasonably be considered confidential based on subject matter or circumstances of disclosure ("Confidential Information"). The parties agree that Confidential Information will be protected in a reasonable and appropriate manner and used only for the purposes it was provided or as otherwise permitted by the disclosing party.

(b) Service Provider may obtain Confidential Information of third parties in connection with Client's contracts with suppliers, manufacturers and other vendors. Service Provider will maintain the confidentiality of all third-party Confidential Information, use it in a reasonable and appropriate manner, and only to the extent necessary to perform its obligations in this Agreement.

(c) Confidential Information will only be disclosed to the parties' personnel with a need to know and will not be disclosed to third parties except in the event Service Provider engages a subcontractor to assist in performance of the Services and then only to the extent subcontractor agrees in writing to protect Confidential Information.

(d) All Confidential Information, whether original or subsequent copies, made available to one another must be returned or destroyed at the request of the disclosing party. However, the receiving party may retain one archival copy for recordkeeping or quality assurance purposes and will make no unauthorized use of such copy.

(e) The obligations in this Section will not apply to information to the extent it is: (i) publicly known; (ii) already known to the receiving party; (iii) lawfully disclosed by a third party; (iv) independently acquired or developed without use of Confidential Information of the other party; or (v) disclosed to taxing authorities or to representatives or advisors in connection with tax filings, regulatory oversight, claims, audits or litigation.

(f)  Notwithstanding anything to the contrary above, if any judicial, legislative or administrative body requests or threatens to compel disclosure of Confidential Information, then unless otherwise legally prohibited, the receiving party will promptly notify the disclosing party and will comply with reasonable requests of the disclosing party (at disclosing party's expense) to assist disclosing party in obtaining a protective order and to prevent or minimize the disclosure of any Confidential Information.  The receiving party may then disclose Confidential Information only if, and to the extent, required by law.

**7. Personally Identifiable Information.** (a) To the extent Service Provider has access to personally identifiable information, Service Provider agrees to use such information only for the purpose of this Agreement and as Client directs.

(b) Client and Service Provider will comply with all applicable laws relating to privacy and the protection of personally identifiable information.

Confidential – for internal use of LMH only

12

DocuSign Envelope ID: 68D09566-A833-4B2D-9DC9-4BCDC8DED7EC

**8. Protected Health Information.** To the extent Service Provider is deemed a "Business Associate" of Client in accordance with the Health Insurance Portability and Accountability Act ("HIPAA"), a Business Associate Agreement will set out the terms and conditions of the use and disclosure of such protected health information.

**9. Access to Billing Books and Records.** If applicable, each party will comply with the requirement of Section 1861(v)(1)(I) of the Social Security Act, as amended, and any written regulations pursuant thereto, governing the maintenance of documentation to verify the cost of Services rendered as follows: (i) Until the expiration of four (4) years after the furnishing of Services, Service Provider agrees to make available, upon written request of the Secretary of the U.S. Department of Health and Human Services, the U.S. Comptroller General, or to any of their duly authorized representatives, this Agreement, and our books, documents and records that are necessary to support the nature and extent of the costs incurred by Client in purchasing Services under this Agreement; (ii) if Service Provider subcontracts any duties arising from this Agreement with a value or cost of $10,000 or more with a related party, such subcontract will contain a clause to the effect of the foregoing sentence; (iii) as used herein, "related party" includes any party employed or controlled by Service Provider, any party by whom Service Provider is employed or controlled, and any party with whom Service Provider develops a close association or affiliation. Service Provider will notify Client promptly of any requests received for access to information described in this Section and will consult with Client regarding the response to be made.

**10. Termination.** (a) A party may terminate this Agreement early without cause upon ninety (90) days' advance written notice to the other party, or earlier if agreed by the parties.

(b) A party may terminate this Agreement for cause if the other party materially breaches the terms of this Agreement and fails to cure such breach within thirty (30) days of receiving written notification of such breach, or as otherwise agreed by the parties.

(d) The termination becomes effective on the last day of the advance notice period required above, or such other date as agreed by the parties (the "Termination Date").

**11. Effect of Termination.** (a) If this Agreement is terminated for convenience by either party, Client will pay Service Provider for all Services rendered, Service Provider Materials provided, expenses incurred, contingent fees earned (if applicable), termination fees (if applicable), or commitments made by Service Provider through the Termination Date in accordance with this Agreement.

(c) If this Agreement is terminated for cause by Client, Client will pay Service Provider for all conforming Services rendered, Service Provider Materials provided, and reasonable expenses incurred through the Termination Date in accordance with this Agreement.

(d) If this Agreement is terminated for cause by Service Provider, all rights granted to Client in this Agreement for continued use of the Services and the Service Provider Materials under Section 2 will terminate as of the Termination Date.

(e) If this Agreement expires or is terminated for any reason, all license rights or other rights granted to Client in the Agreement for access to software or online resources will be extinguished contemporaneously with the termination unless other valid terms exist between Client and Service Provider governing such rights.

(f) The following rights and obligations expressly survive termination of this Agreement: (i) payment for Services rendered, (ii) confidentiality, (iii) indemnification, and (iv) any other provision intended by its express terms or by its nature and context to survive the Term of this Agreement.

**12. Indemnification.** (a) To the extent permitted by law, each party (each, an "Indemnifying Party") will hold harmless and indemnify the other, its parent and affiliated companies and their respective officers, directors, employees, contractors, and agents (each, an "Indemnified Party") against any and all direct loss, liability, damage, or expense ("Claim"), including actual attorneys' fees reasonably incurred, for

Confidential – for internal use of LMH only

13

DocuSign Envelope ID: 68D09566-A833-4B2D-9DC9-4BCDC8DED7EC

breach of confidentiality, injury or death of any person, and damage to real or tangible personal property of the Indemnifying Party arising out of or in connection with willful misconduct or negligent acts or omissions of the Indemnifying Party's employees, contractors, or agents, regarding the performance of, receipt of, and use of, the Services provided. However, neither party will be indemnified for any Claim to the extent resulting from its negligence or willful misconduct. The Indemnifying Party will have the right to participate in the defense of any Claim at its own expense.

(b) To the extent permitted by law, each party will defend, indemnify, and hold harmless the Indemnified Party against any third-party claim arising from the Indemnifying Party's violation of any U.S. copyright, trademark, patent or other U.S. intellectual property rights, so long as the Indemnified Party gives the Indemnifying Party prompt written notice of such a claim. Client agrees to promptly notify Service Provider of any intellectual property rights infringement claim and, as Service Provider requests, Client will cooperate in the defense of such claim. For any claim that Service Provider Materials infringe a third party's U.S. intellectual property right, Service Provider may, at its option, (i) modify such Service Provider Materials to cure the intellectual property right infringement; (ii) procure for Client the right to continue using the Service Provider Materials pursuant to this Agreement; (iii) provide an alternative means of offering the Service Provider Materials; or (iv) terminate access to the infringing Service Provider Materials until such claim is resolved.

(c) The parties acknowledge and agree that from time to time the parties may be subject to subpoenas or other legal requests for production as a result of the relationship created by this Agreement, including requests made in connection with litigation or other dispute, governmental hearings, investigation or other administrative actions (the "Proceedings"). In such event, the party subject to such Proceedings shall indemnify, defend, and hold harmless the other with respect to all costs incurred and claims resulting from the Indemnified Party's response to or compliance with any such subpoena, document request, or similar order.

**13. Limitation of Liability.** (a) NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY TYPE OF DAMAGES FOR ANY AND ALL CLAIMS, IN AGGREGATE, IN EXCESS OF THE AMOUNT OF SERVICE PROVIDER'S FEES UNDER THE SOW FROM WHICH THE CAUSE OF ACTION AROSE.

(b) NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY PUNITIVE OR EXEMPLARY DAMAGES OR LOSS, OR ANY LOST PROFITS, SAVINGS OR BUSINESS OPPORTUNITY, SPECIAL, CONSEQUENTIAL, INCIDENTAL, OR INDIRECT DAMAGES.

**14. Equitable Relief.** Service Provider is entitled to equitable relief, including without limitation, injunctive relief and specific performance, in the event of a breach or threatened breach of the confidentiality obligations and licenses granted to Client in this Agreement and its attachments. Service Provider may seek equitable relief in addition to all other remedies available at law or in equity without the requirement to prove actual damages.

**15. Force Majeure.** (a) Neither party shall be liable hereunder by reason of any failure or delay in the performance of its obligations hereunder (except for payment obligations) on account of strikes, shortages, riots, insurrection, fires, flood, storm, explosions, acts of God, war, governmental action, labor conditions, earthquakes, material shortages or any other cause that is beyond the reasonable control of such party ("Force Majeure Event").

(b) Upon occurrence of a Force Majeure Event, the non-performing party shall promptly notify the other party of occurrence of that Force Majeure Event, its effect on performance, and how long that party expects it to last. During a Force Majeure Event, the nonperforming party will use reasonable efforts to limit damages to the performing party and to resume its performance under this Agreement.

**16. Suspension.** Service Provider reserves the right to suspend Services in the event of non-payment, breach of rights to use Service Provider Materials or confidentiality obligation, or other material breach.

Confidential – for internal use of LMH only

DocuSign Envelope ID: 68D09566-A833-4B2D-9DC9-4BCDC8DED7EC

In the event of suspension, Service Provider will not be liable for any resulting loss, damage, or expense connected with such suspension. Service Provider will continue to comply with the applicable Business Associate Agreement during any suspension.

**17. Non-Solicitation.** Client recognizes that Service Provider's personnel have access to Service Provider's trade secrets and proprietary information and are crucial and necessary to the completion of the project for the Client. During the term of the Agreement, and for a period of one year following its expiration or termination, Client will not directly or indirectly solicit, employ, or otherwise engage a person who participated in the Services under this Agreement on behalf of Service Provider; provided, that this restriction shall not apply to any general solicitation for employees (such as general newspaper advertisements, employment agency referrals, and internet postings) not targeting any such persons, and Client shall not be restricted in hiring any such person who responds to any such general solicitation.

**18. No Relationship, Limited Authority.** (a) Nothing in this Agreement creates any special relationship between the parties, such as a partnership, joint venture, franchise, or employee/employer relationship.

(b) Neither party will have the authority to, and will not, act as agent for or on behalf of the other party or represent or bind the other party in any manner. However, if it is appropriate in the provision of Services that Service Provider review and analyze confidential information of a third party related to contracts between Client and its suppliers, manufacturers or other vendors, Client hereby designates Service Provider as its representative and agent as necessary for such limited purpose.

**19. Client Policies.** If Service Provider personnel are required to comply with Client policies, and Service Provider's policies conflict with Client policies, the parties will work to determine an appropriate solution to ensure that Service Provider's personnel will not be subject to conflicting policies.

**20. Personnel.** Service Provider retains the right to assign and reassign its personnel, as appropriate, to perform the Services.

**21. Subcontract.** Service Provider may use subcontractors in the performance of its Services.

**22. Reference.** Client agrees that Service Provider may refer to Client as a recipient of the Services.

**23. Foreign Taxes.** (a) If Client is required by the laws of any foreign tax jurisdiction to withhold income or profit taxes from payment to Service Provider, then the amount payable by Client upon which the withholding is based, will be paid to Service Provider net of such withholding. Client will pay any such withholding to the applicable tax authority.

(b) However, if after 120 days of the withholding, Client does not provide Service Provider with official tax certificates documenting remittance of the taxes, Client will pay Service Provider an amount equal to the withholding. The tax certificates must be in a form sufficient to document qualification of the taxes for the foreign tax credit allowable against Service Provider's corporation income tax.

**24. Assignment.** Each party may, without the prior written consent of the other party, assign this Agreement to a successor-in-interest or to an entity that acquires all or substantially all of such party's assets in connection with a merger, consolidation, or acquisition, provided however, that the scope of the SOW will remain limited to the facilities, usage limits, affiliates or number of users, as applicable, identified in the SOW and will not be expanded due to any assignment of this Agreement as described above.   Notwithstanding the foregoing, Service Provider may require successors for the Client to provide written affirmation to Service Provider of Client's obligations under this Agreement.

**25. Waiver.** No waiver of any breach of any provision of this Agreement shall constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof. No term of this Agreement will be deemed waived, and no breach of this Agreement excused, unless the waiver or consent is in writing signed by the party granting such waiver or consent.

Confidential – for internal use of LMH only

DocuSign Envelope ID: 68D09566-A833-4B2D-9DC9-4BCDC8DED7EC

**26. Modification.** This Agreement supersedes all prior oral and written communications between the parties with respect to the subject matter of this Agreement, and may be amended, modified or changed only in a writing signed by both parties.

**27. Dispute Resolution.** (a) This Agreement is governed by and construed in accordance with the laws of the State of Illinois without giving effect to conflicts of law rules.

(b) Any controversy or claim arising out of or relating to this Agreement or any breach thereof will be settled by binding arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules. Any arbitration will be conducted in Chicago, Illinois. Any arbitration award may be entered in and enforced by any court having jurisdiction thereof, and each party consents and commits itself to the jurisdiction of the federal and state courts located within the State of Illinois for purposes of enforcement of any arbitration award. Except as may be required by law, neither party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties. Each party will bear its own costs for any dispute, including attorneys' fees.

(c) Notwithstanding the foregoing, the parties will in good faith and for thirty (30) days attempt to resolve any dispute or disagreement arising out of or relating to this Agreement by face-to-face negotiations between an authorized representative of each party. Neither party, however, will be required to pursue this informal dispute resolution process in the event of a dispute regarding an alleged payment, a breach of confidentiality obligations or a violation of intellectual property rights if the party has reason to believe that the delay caused by the informal dispute resolution process would materially harm it.

**28. Notice.** All notices or demands required hereunder shall be in writing and will be served by nationally recognized overnight courier service and will be deemed delivered on the date that the overnight shipping company registers delivery to the appropriate party at the address stated in the SOW, his or her successor, or other designee or officer of the party with a copy to: General Counsel, Huron Consulting Services LLC, 550 West Van Buren St., 17th floor, Chicago, IL 60607.

**29. Binding Effect.** (a) If any portion of this Agreement is held invalid, such invalidity will not affect the validity of the remaining portions of the Agreement and the parties will substitute for any such invalid portion, a provision that best approximates the effect and intent of the invalid provision.

(b) The provisions of this Agreement will be binding upon and inure to the benefit of the respective successors and permitted assigns of the parties.

* * *

Confidential – for internal use of LMH only